T.C. Memo. 2004-108


UNITED STATES TAX COURT



PAUL D. AND GUDRUN G. WEAVER, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 14883-02.              Filed May 3, 2004.


        Petitioners included with their 1998 Federal
income tax return a Schedule C, Profit or Loss From
Business, for "Shrike Cars".  The Schedule C reflected
a net loss of $448,120, which respondent disallowed on
grounds that the costs associated with Shrike Cars were
startup expenditures within the meaning of sec. 195,
I.R.C.

        Held:  Petitioners are not entitled to reduce
their 1998 gross income by the $448,120 claimed net
loss derived from the Shrike Cars enterprise.

        Held, further, petitioners are liable for the sec.
6651(a)(1), I.R.C., addition to tax for failure timely
to file their 1998 income tax return.


Paul D. and Gudrun G. Weaver, pro sese.

Michael J. Proto, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  Respondent determined a Federal income tax deficiency for petitioners' 1998 taxable year in the amount of $47,175 and an addition to tax pursuant to section 6651(a)(1) in the amount of $3,393.75.[1]  After concessions, the issues for decision are:

(1) Whether petitioners are entitled to reduce their 1998 gross income by $448,120, representing the net loss claimed on Schedule C, Profit or Loss From Business, for an enterprise entitled "Shrike Cars"; and

(2) whether petitioners are liable for the section 6651(a)(1) addition to tax for failure to file their 1998 income tax return timely.

Certain additional adjustments made by respondent to petitioners' itemized deductions and exemptions are correlative in nature and need not be separately addressed.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference.  At the time the petition

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the year in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

was filed in this case, petitioners resided in Weston, Connecticut.

Petitioners, husband and wife, filed a joint Form 1040, U.S. Individual Income Tax Return, for the taxable year 1998. The return was filed on January 7, 2000, with the Internal Revenue Service in Andover, Massachusetts. Petitioners reported wage income of $140,316, and attached to the return Forms W-2, Wage and Tax Statement, showing wages paid by Marketing Concepts Group, Inc., of $139,446.44 to Mr. Weaver and $870 to Mrs. Weaver. Petitioners also included with their return two Schedules C and the pertinent (second page) portion of a Schedule E, Supplemental Income and Loss.

On June 25, 1996, previous to filing their 1998 return and presumably in connection with an earlier audit, petitioners had received from the Internal Revenue Service a fax listing several recommendations with respect to petitioners' tax reporting. Among other things, the fax directed that petitioners should "maintain separate Schedule C's [sic] for all different business activities."

The two Schedules C accompanying petitioners' 1998 return both list Mr. Weaver as the proprietor of the business and give a business address identical to that of petitioners' residence. One Schedule C is for a marketing business with the name shown as "Marketing Concepts Group/dba". That Schedule C reflects $95,841

in gross receipts, $64,576 for cost of goods sold, and $42,496 of expenses (including $15,947 for business use of home), for a total net loss of $11,231.

The other Schedule C relates to an "Automobile construction" business operating under the name "Shrike Cars". This Schedule C reports no gross receipts or sales, $374,885 for cost of goods sold,[2] and $73,235 in expenses (specifically, advertising of $24,464, travel of $42,469, and meals and entertainment of $6,302), for a total loss of $448,120.

Taking into account the above wages and losses, as well as a $13,440 Schedule E loss from the S corporation Marketing Concepts Group, Inc., and other income items not pertinent here, petitioners' Form 1040 reports adjusted gross income (loss) of

---

[2] Cost of goods sold is allowable as an offset to gross income in the case of a manufacturing, merchandising, or mining business, but not a service business. Hahn v. Commissioner, 30 T.C. 195, 197-198 (1958), affd. 271 F.2d 739 (5th Cir. 1959); sec. 1.61-3(a), Income Tax Regs. However, even where otherwise appropriate, cost of goods sold generally is not allowable with respect to goods that have not been sold or otherwise disposed of during the taxable year. Jones v. Commissioner, 25 T.C. 1100, 1103-1104 (1956), revd. on other grounds 259 F.2d 300 (5th Cir. 1958); Bernard v. Commissioner, T.C. Memo. 1998-20. Because petitioners in any event reported no gross receipts for Shrike Cars and offered no evidence indicating that any goods were disposed of by the venture, and because the parties did not distinguish at trial or on brief between the various components of the Shrike Cars loss, we shall treat the $374,885 amount as a claim for additional business expenses under sec. 162. See Keegan v. Commissioner, T.C. Memo. 1997-511 (considering reported cost of goods sold to be a claim for sec. 162 expenses).

($232,490), taxable income of $0, and a refund amount due of $33,600 from withholdings.[3]

On June 18, 2002, respondent issued to petitioners a statutory notice of deficiency for 1998.  Therein respondent disallowed, in full, the $448,120 loss claimed by petitioners on the Schedule C for Shrike Cars.  Expenses of $8,086 were disallowed for lack of substantiation.  As to the balance of $440,034, although respondent conceded that the underlying expenditures were substantiated by petitioners, respondent nonetheless determined that the loss was not allowable. Respondent concluded that the expenditures should be capitalized rather than expensed, "since pursuant to section 195 of the Internal Revenue Code the amounts are determined to be start-up and/or organizational expenditures."  Alternatively, the notice disallowed the loss for failure to establish that the activity was engaged in for profit.[4]  No adjustments were made to the

---

[3] The Forms W-2, Wage and Tax Statement, attached to petitioners' return show Federal income tax withholding of $33,588.  The source of the $12 discrepancy is not explained by the record.

[4] At trial, respondent conceded the hobby loss issue and is no longer pursuing disallowance of petitioners' claimed Shrike Cars loss on grounds that the activity was not engaged in for profit.

amounts reported by petitioners in connection with Marketing Concepts Group.[5]

Petitioners filed a petition with this Court challenging the disallowance of their Schedule C loss on the grounds that the adjustments were "made incorrectly based on IRS assumption of a startup business when in actuality it was a continuation of an existing business." At the subsequent trial, Mr. Weaver testified and sought to explain petitioners' business operations. He also introduced a series of exhibits related to these operations.[6]

For several decades, petitioners have been involved with what can be broadly characterized as creative "marketing" endeavors. The purpose of these operations has been and continues to be the provision of advertising, marketing, and business development services for third-party clients and for original concepts developed internally. These efforts have

---

[5] The precise nature of the relationship between the Schedule C business, d/b/a Marketing Concepts Group, and the S corporation Marketing Concepts Group, Inc., is not clear from the record. The S corporation was apparently established to address certain liability issues involved with major accounts and/or public advertising campaigns.

[6] At trial, respondent objected on similar grounds to two of petitioners' exhibits. On the second occasion, a discussion ensued with respect thereto, and the objection was explicitly overruled by the Court. In the interest of consistency and because respondent's objections are, as a practical matter, mooted by our resolution of this case, we clarify that respondent's objection to Exhibit 12-P is also overruled for the same reasons expressed in connection with Exhibit 15-P.

primarily focused on the packaged foods, telecommunications, technology, and automotive industries. Work has been done for clients such as Hershey Chocolate, Cadbury Schweppes, AT&T, Lucent Technologies, Sony Corporation, and the National Hockey League.

The primary operations seem to be conducted under the name Marketing Concepts Group. Additionally, the name "dijit" has been used for certain activities of Marketing Concepts Group that deal with information technology development and projects. Literature for Marketing Concepts Group and dijit identifies Mr. Weaver as president of the enterprise.

Shrike Cars, also referred to as Automotive Design & Engineering, is the working name given to at least some of petitioners' endeavors in the automotive field. As will be explained in greater detail below, since approximately 1994 the Shrike Cars project has sought to identify emerging automotive technologies and to develop them with strategic partners. At the time of trial in late 2003, petitioners had not stopped using the working name Shrike Cars and had not disposed of Shrike Cars. The parties dispute whether the Shrike Cars business is properly characterized as a startup operation in 1998.

OPINION

## I.  Burden of Proof

As a general rule, determinations by the Commissioner are presumed correct, and the taxpayer bears the burden of proving otherwise.  Rule 142(a).  Section 7491 may operate, however, in specified circumstances to place the burden on the Commissioner. Section 7491 is applicable to court proceedings that arise in connection with examinations commencing after July 22, 1998, and reads in pertinent part:

SEC. 7491.  BURDEN OF PROOF.

(a) Burden Shifts Where Taxpayer Produces Credible Evidence.--

(1) General rule.--If, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue.

(2) Limitations.--Paragraph (1) shall apply with respect to an issue only if--

(A) the taxpayer has complied with the requirements under this title to substantiate any item;

(B) the taxpayer has maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews; * * *

* * * * * * *

(c) Penalties.--Notwithstanding any other provision of this title, the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title.

See also Internal Revenue Service Restructuring & Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727, regarding effective date.  Section 7491 is applicable here in that the examination in this case began after the statute's effective date.

With respect to the income adjustments at issue, petitioners have not met the prerequisite of section 7491(a)(1) for placing the burden on respondent.  Legislative history defines "credible evidence" as "the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." H. Conf. Rept. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995; see also Higbee v. Commissioner, 116 T.C. 438, 442 (2001). Here, the evidence produced by petitioners falls short of this standard.

Petitioners submitted 10 documentary exhibits that they believe relate to their automotive ventures and offered the testimony of Mr. Weaver.  Three of the documents bear dates in the period from December 14, 1994, to September 27, 1995.  Five

of the documents are dated from August 24, 1999, to August 27, 2003. Of the two remaining undated documents, one shows 5-year financial projections for 1999 through 2003, and the other is a photograph of an item from a line of auto care products allegedly "sold since 1996". Mr. Weaver's testimony primarily described these exhibits and offered no specific details concerning any activities taking place in 1998. Petitioners therefore would apparently have the Court deduce, by inference, that because petitioners claimed $440,034 in expenses for 1998 related to Shrike Cars that were not otherwise disallowed for lack of substantiation, an active trade or business was being carried on during that year.

In addition to this anachronistic difficulty, the content of the exhibits is problematic. A significant percentage of the documents are related to random proposals for largely unconnected product development projects. With the possible exception of vague testimony from Mr. Weaver that a 2003 proposal had been "accepted", the record is devoid of indication that any project went forward. We thus are unable to determine, beyond surmising that activities continued somewhere on the nebulous continuum from "automobile construction" to "marketing", even the nature of projects pursued by Shrike Cars in 1998. In the absence of any evidence directed toward business operations during the particular year in issue, the Court concludes that petitioners

have not made a prima facie case sufficient to shift the burden to respondent under section 7491(a).

With respect to the delinquency addition to tax, the Commissioner satisfies the section 7491(c) burden of production by "[coming] forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty" but "need not introduce evidence regarding reasonable cause, substantial authority, or similar provisions." Higbee v. Commissioner, supra at 446. Rather, "it is the taxpayer's responsibility to raise those issues." Id. Because, as will be more fully detailed infra, respondent here has by stipulation introduced sufficient evidence to render the section 6651(a)(1) addition at least facially applicable, the burden rests on petitioners to show an exception thereto.

## II. Schedule C Loss

### A. General Rules

Deductions are a matter of "legislative grace", and "a taxpayer seeking a deduction must be able to point to an applicable statute and show that he comes within its terms." New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); see also Rule 142(a). As a general rule, section 162(a) authorizes a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". An expense is ordinary for purposes of this section

if it is normal or customary within a particular trade, business, or industry.  <u>Deputy v. du Pont</u>, 308 U.S. 488, 495 (1940).  An expense is necessary if it is appropriate and helpful for the development of the business.  <u>Commissioner v. Heininger</u>, 320 U.S. 467, 471 (1943).

Implicit in the foregoing definitions is the concept that a taxpayer must in fact be "carrying on" a trade or business for expenditures to be deductible under section 162.  This limitation is made explicit in section 195, as follows:

SEC. 195.  START-UP EXPENDITURES.

(a) Capitalization of Expenditures.--Except as otherwise provided in this section, no deduction shall be allowed for start-up expenditures.

(b) Election To Amortize.--

(1) In general.--Start-up expenditures may, at the election of the taxpayer, be treated as deferred expenses.  Such deferred expenses shall be allowed as a deduction prorated equally over such period of not less than 60 months as may be selected by the taxpayer (beginning with the month in which the active trade or business begins).

(2) Dispositions before close of amortization period.--In any case in which a trade or business is completely disposed of by the taxpayer before the end of the period to which paragraph (1) applies, any deferred expenses attributable to such trade or business which were not allowed as a deduction by reason of this section may be deducted to the extent allowable under section 165.

(c) Definitions.--For purposes of this section--

(1) Start-up expenditures.--The term "start-up expenditure" means any amount--

(A) paid or incurred in connection with--

(i) investigating the creation or acquisition of an active trade or business, or

(ii) creating an active trade or business, or

(iii) any activity engaged in for profit and for the production of income before the day on which the active trade or business begins, in anticipation of such activity becoming an active trade or business, and

(B) which, if paid or incurred in connection with the operation of an existing active trade or business (in the same field as the trade or business referred to in subparagraph (A)), would be allowable as a deduction for the taxable year in which paid or incurred.

The term "start-up expenditure" does not include any amount with respect to which a deduction is allowable under section 163(a), 164, or 174.

(2) Beginning of trade or business.--

(A) In general.--Except as provided in subparagraph (B), the determination of when an active trade or business begins shall be made in accordance with such regulations as the Secretary may prescribe.

(B) Acquired trade or business.--An acquired active trade or business shall be treated as beginning when the taxpayer acquires it.

(d) Election.--

(1) Time for making election.--An election under subsection (b) shall be made not later than the time prescribed by law for filing the return

for the taxable year in which the trade or
business begins (including extensions thereof).

(2) Scope of election.--The period selected
under subsection (b) shall be adhered to in
computing taxable income for the taxable year for
which the election is made and all subsequent
taxable years.

No regulations further defining either startup expenditures
or the beginning of an active trade or business have been
promulgated under section 195.[7] As regards the question of
whether a taxpayer is actively engaged in a trade or business,
the U.S. Supreme Court has established the general rule that
resolution of this issue requires examination of the facts in
each particular case. Commissioner v. Groetzinger, 480 U.S. 23,
36 (1987). Concerning pertinent expenditures, legislative
history affords examples of expenses falling within the intended
operation of the statute:

eligible expenses consist of investigatory costs
incurred in reviewing a prospective business prior to
reaching a final decision to acquire or to enter that
business. These costs include expenses incurred for
the analysis or survey of potential markets, products,
labor supply, transportation facilities, etc. Eligible
expenses also include startup costs which are incurred
subsequent to a decision to establish a particular
business and prior to the time when the business
begins. For example, startup costs include
advertising, salaries and wages paid to employees who
are being trained and their instructors, travel and
other expenses incurred in lining up prospective
distributors, suppliers or customers, and salaries or

---

[7] Regulations do prescribe procedures for making the
pertinent election, effective for elections filed on or after
Dec. 17, 1998. Sec. 1.195-1, Income Tax Regs.

- 15 -

fees paid or incurred for executives, consultants, and for similar professional services.  [H. Rept. 96-1278, at 10-11 (1980), 1980-2 C.B. 709, 712; see also S. Rept. 96-1036, at 11-12 (1980) (containing identical language).]

This Court has identified three elements typically indicative of the existence of a trade or business.  McManus v. Commissioner, T.C. Memo. 1987-457, affd. without published opinion 865 F.2d 255 (4th Cir. 1988).  The taxpayer must: (1) Undertake an activity intending to make a profit; (2) be regularly and actively involved in the activity; and (3) actually have commenced business operations.  Id.  As regards the third, temporal element emphasizing whether a particular trade or business has begun its operations, the following oft-quoted test offers guidance:

> even though a taxpayer has made a firm decision to enter into business and over a considerable period of time spent money in preparation for entering that business, he still has not "engaged in carrying on any trade or business" within the intendment of section 162(a) until such time as the business has begun to function as a going concern and performed those activities for which it was organized. * * * [Richmond Television Corp. v. United States, 345 F.2d 901, 907 (4th Cir. 1965), vacated and remanded on other grounds 382 U.S. 68 (1965).]

See also Jackson v. Commissioner, 864 F.2d 1521, 1525-1526 (10th Cir. 1989), affg. 86 T.C. 492 (1986); Johnsen v. Commissioner, 794 F.2d 1157, 1160-1161 (6th Cir. 1986), revg. and remanding on other grounds 83 T.C. 103 (1984); McKelvey v. Commissioner, T.C.

Memo. 2002-63, affd. 76 Fed. Appx. 806 (9th Cir. 2003); McManus
v. Commissioner, supra.

Stated otherwise, mere research into or investigation of a
potential business is insufficient.  Dean v. Commissioner, 56
T.C. 895, 902 (1971); McKelvey v. Commissioner, supra.  Thus,
while it is true that an enterprise need not have generated sales
or other revenue to have begun to carry on a business, it must
nonetheless have started to function in a particular and
identifiable line of work.  Cabintaxi Corp. v. Commissioner, 63
F.3d 614, 620-621 (7th Cir. 1995), affg. in part, revg. in part,
and remanding T.C. Memo. 1994-316; Jackson v. Commissioner, supra
at 1526 & nn.7-8; Blitzer v. Commissioner, 231 Ct. Cl. 236, 684
F.2d 874 (1982).

B.  Analysis

Evaluation of whether Shrike Cars constituted an active and
ongoing trade or business in 1998 is complicated by the ambiguity
in the record with respect to (1) the specific nature of the
business in which Shrike Cars engaged and (2) the relationship of
Shrike Cars to petitioners' other business endeavors.  This
confusion is in part the result of the business decisions of
petitioners to conduct some activities through their separate S
corporation, Marking Concepts Group, Inc., and others through
their two Schedule C proprietorships.  Critically, however,

petitioners have at no time throughout this proceeding raised an argument that the Shrike Cars operations should be considered as a component of one of their other entities or ventures. Furthermore, taxpayers in general must live with the manner in which they have structured and delineated their business entities and transactions. See Commissioner v. Natl. Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974) ("This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not.") Accordingly, our inquiry is whether Shrike Cars, viewed as a stand-alone concern, had achieved the status of an active trade or business in 1998.

As alluded to previously, the principal inference to be drawn from the record seems to be that the alleged Shrike Cars business rested somewhere on a continuum from vehicle production to marketing and that petitioners engaged in a variety of other activities at the marketing end. Yet the above authorities direct our attention to whether Shrike Cars had begun to function as a going concern in performing the activities for which it was organized. The intended discrete business of Shrike Cars is therefore a pertinent fact. However, because we conclude that the record fails to show that Shrike Cars had begun in 1998 to

function as an ongoing and independent production or marketing enterprise, a definitive determination as between the two becomes unnecessary.

1.  Implications From the Evidentiary Record

The Schedule C attached to petitioners' 1998 Form 1040 characterizes Shrike Cars as an "Automobile construction" business.  The cursory, single-page "5 YEAR FINANCIAL PROJECTIONS" document submitted by petitioners bases the listed gross sales figures on the number of "Mark I" and "Mark II" vehicles (labels not otherwise used in the record) sold, from an estimated 4 in 1999 to 260 in 2003.  Hence, some of the evidence does appear to reflect that Shrike Cars' intended function was to operate in the field of automobile production, and we begin our analysis with consideration of the record in light of this characterization.

A December 14, 1994, document purportedly summarizing the Shrike Cars business lists several "AD&E concepts that are ready for development with an investor/manufacturer".  No mention is made of any postconcept operations.  The document would therefore seem to imply that, as of late 1994, Shrike Cars was not yet engaged in actual commercial development, much less production, of any particular automotive concept.

This impression is reinforced by the three automotive proposals to third parties contained in the record.  Dated April

24, 1995, September 27, 1995, and August 18, 2003, each of the proposed projects appears to begin with some type of a design or engineering phase culminating in prototype vehicles.  Further, only the September 27, 1995, proposal relating to motorcycle-powered vehicles appears even to have reached the prototype level.  Language included in that proposal implies that an ostensible partner of Shrike Cars, TRA Racing, had by 1995 developed and manufactured a few prototype lightweight vehicles (880 lbs.) powered by Kawasaki engines and using Mini Domino bodies.  Petitioners contend that at an undisclosed later date TRA Racing used bodies designed by Shrike Cars on a small number of similar vehicles.  Nonetheless, there remains no indication that either of the 1995 proposals, or any other possible automotive proposal advanced prior to 2003, ever went forward so as to generate ongoing development or production activity on the part of Shrike Cars by the end of 1998.

Concerning the more nebulous characterization of Shrike Cars as a "marketing" enterprise, Mr. Weaver testified at trial that "the important point is we don't manufacture vehicles.  We are the design, concept, prototyping people.  Other people then pick up from there to manufacture it and move it into the marketplace, but we will sell it for them."  He described Shrike Cars as "a resource for innovative development of automotive concepts, design, engineering and marketing, providing a complete service

for consulting, concept and design development, styling, scale-model building and prototypes."

The impression left by the foregoing statements is that an ongoing marketing business involves the provision of a variety of services, typically focused on a particular product or products, to one or more third-party clients or strategic partners. A marketing enterprise functioning as a going concern would have advanced beyond the internal generation of a few potential product concepts. However, materials in the record do not reflect that, as of late 2003, the operations of Shrike Cars were other than limited to having solicited interest, apparently without material success, in several such concepts.

Furthermore, the variety of the concepts floated in the various proposals and documents suggests that Shrike Cars' efforts and eventual line of work or niche remained unfocused and malleable even through 2003. Materials from the 1994 to 1995 period promote the idea of designing one-of-a-kind vehicles for celebrities, of producing reduced-emission vehicles for commercial applications, of redesigning existing vehicle models for an overseas manufacturer, and of developing a motorcycle-powered sports car. The 2003 proposal then relates to the "development of a unique sports car made specifically for the China market." The proposal begins with a lengthy research and development phase and does not appear to have drawn on or

incorporated any of the specific concepts promoted in the 1994 and 1995 materials.

Moreover, two of the proposals contained in the record, those related to the motorcycle-powered vehicle and the sports car for China, set forth a plan or integrated step labeled "marketing". The activities described thereunder include the creation of a brand identity encompassing logo, badge, and official colors; the development of sales and distributions networks; the preparation of marketing materials such as brochures, CD/DVDs, and videos; targeted advertising campaigns in television and print media; introduction of vehicles at automobile shows; provision of loaner vehicles to driving schools; and consideration of a motorsports program to build brand awareness and prestige. Again, the evidence does not show that the Shrike Cars vehicle venture ever reached a stage with respect to any product that included similar comprehensive efforts that would correlate with these descriptions of a marketing program.

The sole item related to the Shrike name that the evidence could suggest was commercially marketed prior to 1996 was a line of auto care products. Petitioners introduced a picture of a bottle of "Shrike Coach Wash", and Mr. Weaver testified: "we have been selling, since 1996, automotive-care products and they've gone under a variety of names, one of which was Shrick

[sic]."  No other documentary evidence elaborated upon these purported sales or the status of the line in 1998.  Critically, however, even if the products continued to be sold in 1998, petitioners apparently did not consider the endeavor connected to the "Automobile construction" business for which they submitted a Schedule C, in that no gross receipts were reported.  They also never alleged that any of the expenditures reported on the Schedule C derived from these products.  We therefore conclude that the potential existence at some point of this product line has little, if any, bearing on whether the Schedule C business was a going concern in 1998.

Finally, the exhibits introduced by petitioners also contain three letters dated from August through November of 1999 regarding potential investment by third parties in Shrike Cars. These letters make no mention of any specific project and therefore cannot imply the existence of any definite and focused ongoing business.

On this record, the Court can only surmise that Shrike Cars was at most in the startup phase of any automobile construction or automobile marketing venture in 1998.  The evidence indicates that the expenditures reported on petitioners' Schedule C are within the pale of section 195 costs, particularly as elucidated in legislative history.  A significant portion of petitioners' exhibits relate to proposals soliciting third-party interest, and

the expenses specifically identified on the Schedule C are for advertising, travel, meals, and entertainment. The legislative history references costs for exploring potential markets and products and "incurred in lining up prospective distributors, suppliers or customers". H. Rept. 96-1278, supra, 1980-2 C.B. at 712. Advertising and travel expenses are also expressly highlighted. Id. Petitioners have failed to show that the operations of Shrike Cars in 1998 had advanced beyond such activities in the nature of exploration or preliminary solicitation.

### 2. Comparisons to Caselaw

Both parties cite various cases that they maintain parallel the factual circumstances at bar. Petitioners, for instance, allege similarities to Cabintaxi Corp. v. Commissioner, 63 F.3d 614 (7th Cir. 1995), Blitzer v. Commissioner, 231 Ct. Cl. 236, 684 F.2d 874 (1982), and Lamont v. United States, 80 AFTR 2d 97-7320, 97-2 USTC par. 50,861 (Fed. Cl. 1997). Respondent, in contrast, emphasizes scenarios such as those in McKelvey v. Commissioner, T.C. Memo. 2002-63, and Reems v. Commissioner, T.C. Memo. 1994-253.

Petitioners rely on Cabintaxi Corp. v. Commissioner, supra, for the proposition that "a business operation commences when the entity starts to operate toward the goal of selling products", without regard to whether the operation is successful in

generating revenue. In <u>Cabintaxi Corp. v. Commissioner</u>, <u>supra</u> at 620, the taxpayer corporation was formed in 1981 for the expressed purpose of selling, installing, and maintaining automated transportation systems. In 1984, the taxpayer entered into a distributorship with a German company to market in the United States and Canada the "Cabintaxi" system developed abroad by the German company. <u>Id.</u> Although the taxpayer never obtained any customers for the system, it sought to deduct expenses in 1984 and 1985 as an ongoing trade or business. <u>Id.</u> at 618-620. The Court of Appeals, disagreeing with this Court, held in favor of the taxpayer. <u>Id.</u> at 620-621.

In reversing our decision below, the Court of Appeals noted that the "Tax Court's reasoning confuses business activity with the purpose of the activity." <u>Id.</u> at 620. The Court of Appeals stated:

> The principal purpose for which Cabintaxi was formed was to make money, and to do this it had * * * to sell, install, or maintain automated transit systems. But before it could sell, install, or maintain its first system, it had to sell the system, and to sell it had to incur selling expenses. Those expenses were an integral part of being in the business of selling automated transit systems. [<u>Id.</u>]

Hence, the crucial fact that the German transportation system was already developed and commercially available enabled the Court of Appeals to equate the signing of the U.S. and Canadian distribution agreement, coupled with prompt commencement of

actual sales and marketing activities, with the start of an active trade or business as a distributor for the Cabintaxi system. Id. at 620-621.

In contrast, petitioners here have failed to prove that Shrike Cars' efforts in 1998 ever reached a point where there existed a commercial product to sell and/or that they were focused on selling, marketing, or distributing a specific product or products. Rather, the Shrike Cars business, as of 1998, remained in an exploratory stage. Notably, the taxpayer in Cabintaxi Corp. v. Commissioner, supra, did not take the position, and the Court of Appeals for the Seventh Circuit did not hold, that costs incurred prior to 1984 should be deductible as expenses of an ongoing business. After its founding in 1981 and before 1984, the taxpayer "investigated opportunities for creating and deploying automated transit systems" and "hoped to form an alliance with an individual who was developing an automated transportation system." Cabintaxi Corp. v. Commissioner, T.C. Memo. 1994-316, affd. in part, revd. in part and remanded 63 F.3d 614 (7th Cir. 1995). The taxpayer characterized costs incurred during that period as startup and organizational expenditures, which it capitalized and sought to amortize beginning in 1984 under sections 195 and 248. Id.

Here, Shrike Cars' activities would appear more akin to Cabintaxi Corp.'s pre-1984 endeavors, which endeavors were

characterized even by Cabintaxi Corp. as startup operations. In effect Shrike Cars was searching for a manufacturer who would play a key role in developing, fabricating, testing, producing, and selling one of Shrike Cars' concept vehicles. But in 1998, that manufacturer had not been found and a concept vehicle commercially attractive to a manufacturer had not yet been identified.

Lamont v. United States, supra, and Blitzer v. United States, supra, are similarly distinguishable. As in the Cabintaxi Corp. situation, the entities in both of those cases had committed to a specific product or project and taken substantial and formal steps with respect thereto. The corporation in Lamont v. United States, 80 AFTR 2d at 97-7321 to 97-7322, 97-2 USTC at 90,423-90,424, had been formed to develop language translation software, received a copyright on its system in February of the year in issue, had programmers and third-party consultants actively working to revise the system throughout that year, and even made an unsolicited sale of the system before yearend.

Blitzer v. United States, 684 F.2d at 877-878, involved a partnership formed to develop and operate a subsidized housing project through a program administered by the U.S. Department of Housing and Urban Development (HUD). Although initial steps in the project were taken during 1971, the court found the critical

date for commencement of a trade or business, within the meaning of section 162, to be October 23, 1973, when closing on the project took place and the formal regulatory agreement between the partnership and HUD was executed. Id. at 877-881, 895. The court noted that by this date "the partnership had acquired the land, had arranged for financing of the project, had executed its building loan agreement and given a note therefor, had received substantial funds, and had prepared plans for actual construction of its apartments (which began shortly thereafter)." Id. at 880.

The necessity for a comparable commitment to a particular and focused project is highlighted by contrast with cases cited by respondent. In McKelvey v. Commissioner, T.C. Memo. 2002-63, for instance, the taxpayer conducted a prepurchase economic and market feasibility study on a parcel of forestland, purchased the land with the intent to start a tree-farming business, engaged a third-party professional to prepare a forest management plan, and conducted an unsuccessful test pilot planting. However, the taxpayer by the end of the period in issue "had not decided which species of trees to plant and had not harvested any of the existing trees on his property". Id. The Court held that any expenditures were fairly characterized as startup expenses. Id.

Likewise, Reems v. Commissioner, T.C. Memo. 1994-253, involved a venture to raise and harvest timber. During the year in issue, taxpayer acquired the property and engaged a woodsman

who cleared and prepared logging roads on the premises. Id. The taxpayer also made incidental sales of two walnut trees to the woodsman and of firewood generated from the clearing activities. Id. Nevertheless, observing that the taxpayer had not acquired an already functioning business and citing Richmond Television Corp. v. United States, 345 F.2d at 907, this Court found a new business had not yet begun. Reems v. Commissioner, supra. Therefore, section 195 applied on grounds that the endeavor constituted a startup within the meaning of that statute. Id.

Again, the record here does not reveal that Shrike Cars' activities in 1998 had progressed beyond preparatory steps such as those identified in McKelvey v. Commissioner, supra, and Reems v. Commissioner, supra, or had risen to the level of formal commitment with material efforts toward a specific project as was shown by the taxpayers in Cabintaxi Corp. v. Commissioner, 63 F.3d 614 (7th Cir. 1995), Blitzer v. Commissioner, 231 Ct. Cl. 236, 684 F.2d 874 (1982), and Lamont v. United States, 80 AFTR 2d 97-7320, 97-2 USTC par. 50,861 (Fed. Cl. 1997). The Court holds that the costs claimed on petitioners' Schedule C for Shrike Cars are startup expenditures falling within the purview of section 195. Accordingly, petitioners must capitalize such costs to the extent substantiated and are not entitled to reduce their 1998 gross income by the claimed loss of $448,120 derived from Shrike Cars.

III.  <u>Section 6651(a)(1) Addition to Tax</u>

Section 6651(a)(1) imposes an addition to tax for delinquency in filing returns and provides in relevant part as follows:

> SEC. 6651.  FAILURE TO FILE TAX RETURN OR TO PAY TAX.
>
> (a) Addition to the Tax.--In case of failure--
>
> (1) to file any return required under authority of subchapter A of chapter 61 * * * , on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate;

The Supreme Court has characterized the foregoing section as imposing a civil penalty to ensure timely filing of tax returns and as placing on the taxpayer "the heavy burden of proving both (1) that the failure did not result from 'willful neglect,' and (2) that the failure was 'due to reasonable cause'", in order to escape the penalty.  <u>United States v. Boyle</u>, 469 U.S. 241, 245 (1985).  "Willful neglect" denotes "a conscious, intentional failure or reckless indifference."  <u>Id.</u>  "Reasonable cause" correlates to "ordinary business care and prudence".  <u>Id.</u> at 246 & n.4; sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

As previously indicated, section 7491(c) places the burden of production on the Commissioner.  Here, respondent's burden is satisfied by the stipulation of the parties that petitioners' 1998 return was filed on January 7, 2000.  This date is well over the 5 months necessary to impose the maximum penalty.  Since petitioners have offered no explanation for the untimeliness, either at trial or on brief, they have failed to establish any reasonable cause.  We therefore hold that petitioners are liable for the section 6651(a)(1) delinquency addition to tax at the 25 percent rate.

To reflect the foregoing and concessions made,

<u>Decision will be entered</u>

<u>for respondent</u>.