T.C. Summary Opinion 2012-73

UNITED STATES TAX COURT

W.T. BRAMLETT II, a.k.a. WILLIAM T. BRAMLETT II AND MELINDA H. BRAMLETT, a.k.a. M.H. BRAMLETT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13639-10S.                                    Filed July 25, 2012.

W.T. Bramlett II and Melinda H. Bramlett, pro sese.

Horace Crump, for respondent.

SUMMARY OPINION

MARVEL, Judge:  This case was heard pursuant to the provisions of section 7463.[1]  Pursuant to section 7463(b), the decision to be entered is not reviewable by

_____

[1]Unless otherwise indicated, section references are to the Internal Revenue Code (Code), as amended and in effect for the year at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

any other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined a deficiency of $30,274 in petitioners' Federal income tax and an accuracy-related penalty under section 6662(a) of $6,054.80 for 2007. After concessions,[2] the issues for decision are: (1) whether petitioners are entitled to business expense deductions claimed on their 2007 Schedule C, and (2) whether petitioners are liable for the accuracy-related penalty under section 6662(a). As a threshold matter, we must decide whether W.T. Bramlett II (petitioner) commenced a trade or business during 2007.[3] We hold that he did not.

Background

Some of the facts have been stipulated. The stipulated facts are incorporated in our findings by this reference. Petitioners resided in Mississippi when they filed their petition.

---

[2]As described infra p. 9, after their Tax Court case for the year 2006 was resolved, petitioners submitted to the Court an amended return for 2007 showing a smaller net loss on their Schedule C, Profit or Loss From Business. We shall treat the amended return as petitioners' concession of the amounts of various Schedule C deductions.

[3]Petitioners filed a joint Federal income tax return for 2007. Mrs. Bramlett did not participate in Mr. Bramlett's activities at issue in this case.

I.     Petitioner's Schedule C Activities

The adjustments in this case arise from petitioner's alleged business activities. Petitioner is a graduate of the U.S. Naval Academy and holds a master of science degree in mechanical engineering from the Naval Postgraduate School and a master in business administration degree from the University of Southern Mississippi. Petitioner started flying aircraft in 1993, after retiring from the U.S. Navy. During 2007 he was employed by Northrop Grumman Ship Systems.

Since the 1990s petitioner has engaged in a variety of activities, most of which relate to aviation. Although the 2007 Schedule C identifies his business as "Will Bramlett Aerial Photography",[4] petitioner's aviation activities have included aerial photography and the sale of an airplane as well as efforts to build rental hangars, acquire an airport, and become a dealer for two aircraft manufacturers. As we describe below, in 2007 he was pursuing only some of these efforts.

---

[4]Petitioners used TurboTax to prepare their 2006 and 2007 returns, and on the 2007 Schedule C, TurboTax filled in the business name field using the 2006 Schedule C. Petitioner credibly testified, and we find, that his activities were not limited to aerial photography.

In approximately 1993 petitioner decided to build 22 rental hangars near the Ocean Springs Airport (airport) in Ocean Springs, Mississippi.[5]  Because petitioner needed the land on which to build the hangars, in late 1993 he acquired lots adjacent to the airport (collectively, property) from four different owners.  The property was zoned for residential use, and petitioner's request to change the zoning was unsuccessful.  Consequently, he was unable to proceed with the hangar project.  Petitioner continues to own the property and has been seeking alternative ways to develop it until he obtains a zoning change.  For example, at some point he unsuccessfully attempted to build a hangar that would be a residence for flight instructors.

In 1998 or 1999 petitioner decided to submit an application to become a certified dealer and open a service center for Cessna.[6]  To do so, he, together with the airport owners, applied for and obtained from the U.S. Department of Transportation Federal Aviation Administration (FAA) a repair station certificate with limited radio, limited airframe, and limited instrument ratings.  The certificate was issued in the business name "Ocean Springs Avionics".  In the meantime,

-------

[5]The airport had a 3,500-foot runway suitable for single-engine and twin-engine propeller planes.

[6]We infer from the record that Cessna is an airplane manufacturing corporation.

however, Cessna increased dealership capital requirements from $250,000 to $2.5 million. Such a large investment was not feasible for petitioner, and he abandoned the Cessna dealership project.

At some point before 2007 petitioner investigated the process of becoming a dealer for Quicksilver Manufacturing, Inc. (Quicksilver), a manufacturer of light sport aircraft (LSA). Petitioner, who was familiar with the area demographics, believed that a large number of local professionals could afford flight training and airplane ownership. On a date that does not appear in the record, petitioner approached Quicksilver, and on January 23, 2007, he received a reply email generally describing a potential dealership territory and pricing.

Because LSAs are small aircraft, the certification requirements were feasible for petitioner. To become a certified dealer and open a repair station, petitioner had to demonstrate to Quicksilver that he was able to manufacture an LSA within 60 days and that he had a facility and the ability to repetitively build LSAs. As a preliminary step, in 2007 petitioner hired concrete companies and a smoother and expanded a hangar that he owned. In April 2007 petitioner traveled to Florida to attend an FAA repair certification course. Thereafter, during 2007 petitioner was building a Quicksilver LSA as a demonstration model, and he completed it by

January 31, 2008. As of the date of trial, petitioner's LSA was in his hangar. It is airworthy but did not undergo a test flight with the FAA.

Until petitioner meets Quicksilver's prerequisites, he may not operate a certified manufacturing facility and may not manufacture LSAs for sale. In 2007 petitioner did not meet Quicksilver's prerequisites. He also did not offer himself as a certified repairman for profit or advertise his services.

Although petitioner built a demonstration model of an LSA, after 2007 he ceased his efforts to obtain certification because of unexpected changes in circumstances. In 2008 the airport owner closed the flight school, laid off employees, and put the airport up for sale. Petitioner organized a group of individuals to buy the airport, but the group did not raise sufficient funds. After the flight school closure, petitioner's plan of opening an LSA dealership was no longer viable.

Starting in 2002, petitioner also engaged in an aerial photography activity, although in 2007 he did not focus on it. Petitioner used his aerial photography skills in his employment in shipbuilding for Northrop Grumman. Petitioner's aerial photographs helped Northrop Grumman produce evidence of ship construction progress, identify Hurricane Katrina as the cause of a crack in a generator's stainless steel exhaust, and in 2003 plan facility expansion for more efficient

shipbuilding. In addition, petitioner's aerial photos allowed his team at Northrop Grumman to be awarded contracts. In 2006 petitioner's aerial photographs assisted the vice president of engineering of Northrop Grumman in determining the necessary height of the Ocean Springs Bridge and facilitated petitioner's transfer to Northrop Grumman's engineering group.

Petitioner did not invoice Northrop Grumman for the photographs and his aerial photography services, but Northrop Grumman compensated him with higher wages and bonuses. Petitioner's special contributions in the course of his employment led to increased compensation starting in 2003, and peaking in 2006, when he transferred to the engineering group. Petitioner's wages from Northrop Grumman for 2007 were also positively affected by his use of the aerial photography skills in his employment.[7]

In addition, upon the U.S. Navy's request, petitioner took aerial photographs of homes destroyed by Hurricane Katrina.[8] The local supervisor of shipbuilding used those photographs to show the Secretary of the Navy the extent of the hurricane damage during a helicopter tour.

---

[7] It is not clear, however, what, if any, specific aerial photography projects petitioner worked on in 2007.

[8] The record does not reflect whether petitioner was paid for these aerial photographs.

Petitioner maintained a bank account in the name of Will Bramlett Aerial Photography that he used for paying all expenses related to his Schedule C activities. Petitioner kept all such expense-related documents in boxes organized by year. To protect documents from flooding after Hurricane Katrina, petitioner started scanning critical documents and keeping paper documents in plastic containers. To prepare his returns, petitioner entered each expense into a spreadsheet and assigned each item an expense code.

II.     Procedural History

Petitioners timely filed their joint 2007 Federal income tax return. They attached a Schedule C for Will Bramlett Aerial Photography on which they reported gross receipts of $10,700 and expenses totaling $111,489. The Schedule C gross receipts were unrelated to aerial photography or the Quicksilver dealership project; they were generated from the sale of a truck that petitioner had renovated. Petitioners' Schedule C reporting for other years was as follows:

| Year | Gross receipts | Schedule C net loss |
|------|----------------|---------------------|
| 2002 | $150 | $61,088 |
| 2003 | 450 | 67,643 |
| 2004 | [1]2,200 | 72,261 |
| 2005 | 1,175 | 90,177 |
| 2006 | 1,300 | [2]83,066 |
| 2007 | 10,700 | 100,789 |
| 2008 | -0- | 53,132 |
| 2009 | -0- | 34,564 |

[1]Gross receipts for 2004 do not include receipts from a sale of an airplane which petitioners reported separately. Petitioners do not explain the source of gross receipts for the years other than 2007.

[2]The loss for 2006 does not take into account the settlement described below.

At some point after petitioners filed their 2007 return, respondent examined their 2006 return and issued a notice of deficiency. Petitioners filed a petition with the Tax Court, and subsequently the parties entered into a stipulated decision, according to which petitioners were entitled to deduct a Schedule C loss of $70,769 (settlement for 2006). After the settlement for 2006 petitioners prepared an amended return for 2007 and reported Schedule C expenses of $48,558 and a loss of $37,858. Respondent did not process the amended return. We shall treat the amended return for 2007 as petitioners' concession as to the amounts of expense deductions claimed.[9]

_____

[9]On the basis of the amended return introduced into the record, we deem

(continued...)

In the notice of deficiency for 2007 respondent disallowed in full the claimed Schedule C deductions of $111,489 on the ground that petitioner's activity "does not meet the guidelines of carrying on a trade or a business within the meaning of the Internal Revenue Code Section 162". Respondent also stated that petitioner failed to establish that the expenses did not arise from his employment and

---

[9](...continued) petitioners to concede that the Schedule C expenses in 2007 were as follows:

| Expense | Amount |
|---|---|
| Car and truck | $2,010 |
| Depreciation and sec. 179 expense deduction | 13,673 |
| Mortgage interest | 3,901 |
| Other interest | 659 |
| Legal and professional services | 1,175 |
| Office | 7,154 |
| Repairs and maintenance | 1,172 |
| Supplies | 2,390 |
| Travel | 2,259 |
| Deductible meals and entertainment | 650 |
| Utilities | 1,791 |
| Other | 11,724 |
| Total | 48,558 |

According to the amended return, petitioners' "Other" expenses consisted of plane expenses of $5,864, computer equipment of $2,980, and plane equipment of $2,880.

that "[i]f you do not carry on your business or investment activity to make a profit, you can not use a loss from this activity to offset other income."

## Discussion

I.     Burden of Proof

Generally, the Commissioner's determinations are presumed correct, and the taxpayer ordinarily bears the burden of proving that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Moreover, deductions are a matter of legislative grace, and the taxpayer bears the burden of proving that he is entitled to any deduction claimed. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). However, the Commissioner bears the burden of proof with respect to "any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer".[10] Rule 142(a)(1). In addition, section 7491(a)(1) may shift the burden to the Commissioner with respect to factual issues

---

[10]On brief respondent states that petitioners' expenses are not deductible because they are startup expenditures under sec. 195. Respondent did not specifically mention sec. 195 in the notice of deficiency, but his argument on brief is consistent with the notice of deficiency and is not a new matter. See Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989) ("A new theory that is presented to sustain a deficiency is treated as a new matter when it either alters the original deficiency or requires the presentation of different evidence. * * * A new theory which merely clarifies or develops the original determination is not a new matter in respect of which respondent bears the burden of proof."); see also Shea v. Commissioner, 112 T.C. 183, 191-197 (1999).

if the requirements of section 7491(a)(2) are met. Petitioners do not contend that section 7491(a) shifts the burden of proof to respondent, and the record does not permit us to conclude that the requirements of section 7491(a)(2) are met. Accordingly, petitioners bear the burden of proving that they are entitled to the claimed deductions.

II.    Schedule C Deductions

Respondent contends that petitioner's Schedule C activity was not an activity engaged in for profit under section 183. In the alternative, respondent contends that petitioner's Schedule C expenses are nondeductible startup expenses.

Generally, section 162 allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. We examine all of the facts and circumstances to decide whether the taxpayer's activities constitute the carrying on of a trade or business. Commissioner v. Groetzinger, 480 U.S. 23, 36 (1987). The taxpayer's trade or business must be functioning as a business when the expenses are paid or incurred, and those expenses must be directly connected with or pertain to that business. Hardy v. Commissioner, 93 T.C. 684, 687 (1989), aff'd in part, remanded in part per order (10th Cir. Oct. 29, 1990); sec. 1.162-1(a), Income Tax Regs. "A taxpayer

is not carrying on a trade or business under section 162(a) until the business is functioning as a going concern and performing the activities for which it was organized." Glotov v. Commissioner, T.C. Memo. 2007-147. The taxpayer's activity need not have generated revenue but "'it must nonetheless have started to function in a particular and identifiable line of work.'" Bailey v. Commissioner, T.C. Memo. 2012-96 (quoting Weaver v. Commissioner, T.C. Memo. 2004-108).

Until the business starts operating as a going concern, expenses related to that activity are not ordinary and necessary expenses currently deductible under section 162 but rather are startup or preopening expenses. Hardy v. Commissioner, 93 T.C. at 687-688. The Code defines startup expenditures as any amount paid or incurred in connection with investigating the creation or acquisition of an active trade or business, creating an active trade or business, or any activity engaged in for profit and for the production of income before the day on which the active trade or business begins, in anticipation of the activity's becoming an active trade or business and which, if paid or incurred in connection with the operation of an existing active trade or business would be allowable as a deduction for the taxable year in which paid or incurred. Sec. 195(c).

Cost recovery of startup expenditures is governed by section 195. Section 195(a) provides that, except as described therein, no deduction is allowed for startup expenditures. Under section 195(b) a taxpayer may elect to amortize startup expenditures beginning with the month in which the active trade or business begins.[11] Because the amortization period starts when the active trade or business begins, see sec. 195(b)(1), no deduction is allowed with respect to items incident to a trade or business which the taxpayer does not commence, see H.R. Rept. No. 96-1278, at 12-13 (1980), 1980-2 C.B. 709, 713-714. We must decide whether petitioner completed the startup phase and became actively engaged in a trade or business during 2007.

As a preliminary matter, we note that petitioner treated all his activities as one, having filed one Schedule C, and respondent does not distinguish among petitioner's activities for purposes of his section 195 argument. However, during

---

[11]Even in the absence of an election, under sec. 1.195-1(b), (d), Income Tax Regs. (as revised in 2011), a taxpayer might be entitled to sec. 195 amortization of expenses incurred after October 22, 2004, because the taxpayer is deemed to have made such an election. This regulation applies to expenses paid or incurred after October 22, 2004, provided the applicable limitations period has not expired for the year the election under sec. 195 is deemed made. Sec. 1.195-1(d), Income Tax Regs.

2007 petitioner's activities included (1) the activity of attempting to become a Quicksilver dealer, and (2) the aerial photography activity.[12]

We first address the Quicksilver dealership project. Although we found petitioner's testimony to be credible, it established that he did not complete the startup phase and was not actively engaged in a Quicksilver dealership business when he incurred the expenses. During 2007 petitioner expanded his hangar, attended an FAA course, communicated with Quicksilver regarding his interest, and was in the process of building a demonstration model. However, petitioner did not finish the demonstration model until January 2008 and did not manufacture any LSAs for sale. He did not advertise his services or products and did not hold himself out as a dealer or repairman for Quicksilver. We conclude that in 2007 petitioner did not commence the business of being a Quicksilver dealer, for which he was preparing. Accordingly, petitioner's expenses related to the Quicksilver project were not paid or incurred in the course of an active trade or business. Even if petitioner's expenses related to the Quicksilver dealership project did qualify as startup expenditures, the amortization period did not commence, and petitioner

---

[12]All gross receipts in 2007 derived from the sale of a truck, and neither activity generated sales.

may not amortize those expenditures.[13] We therefore sustain respondent's determination disallowing deductions related to the Quicksilver dealership project.

We now consider petitioner's aerial photography activity. Petitioner credibly testified that he had engaged in aerial photography for several years before 2007 and described a number of completed projects, most, if not all, of which were for Northrop Grumman.[14] We therefore find that his aerial photography activity passed the startup stage before 2007. However, petitioner did not establish what aerial photography projects, if any, he worked on during 2007 and what business activity related to the aerial photography activity he engaged in during 2007.

Even if we were to assume that petitioner conducted aerial photography as a business with requisite continuity and regularity, see Commissioner v. Groetzinger, 480 U.S. at 35, and that he engaged in it for profit, see sec. 183(a), the record does

---

[13]The parties do not address the deductibility of the loss under sec. 165 as an alternative ground. In any case, we find that as of the end of 2007 petitioner had not abandoned his efforts to obtain a Quicksilver dealership, and therefore no deduction for 2007 under sec. 165(a) is appropriate. Only the 2007 taxable year is before us, and therefore we do not need to decide whether a sec. 165(a) deduction is appropriate for another year.

[14]Petitioner therefore should have reported expenses attributable to that activity as unreimbursed employee expenses, rather than Schedule C expenses.

not allow us to ascertain what portion of the total expenses related to the operation of the aerial photography business in 2007 and whether those expenses meet the requirements of section 162. As stated above, taxpayers may deduct ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Sec. 162. An expense is necessary if it is helpful or appropriate to the taxpayer's business. Welch v. Helvering, 290 U.S. at 113.

Although petitioner introduced into the record a summary of the expenses that he deducted, he did not present original records, nor did he explain what the expenses were for. Most expenses, such as Home Depot expenses, appear to relate to the Quicksilver dealership activity, and more specifically, to the hangar expansion. As we stated above, those expenses are not deductible under section 195(a). Petitioner's summary of expenses also suggests that he purchased photo equipment and paid office expenses, but petitioner did not explain what specific items he purchased and what the business purpose of each purchase was. Lastly, petitioner claimed utility and mortgage interest expense deductions, but he

presented no credible evidence that he maintained an office. We sustain

respondent's determination disallowing the Schedule C deductions.[15]

Petitioner also contends that the settlement for 2006 should have precedential

effect for 2007, namely that respondent should continue to recognize his business.

We consider each taxable year separately, and the Commissioner is not estopped

from asserting a different position for later years. See Rose v. Commissioner, 55

T.C. 28, 32 (1970). Accordingly, the parties' settlement for 2006 does not affect or

control our conclusions in this case.

III.    Section 6662(a) Penalty

In his brief respondent contends that petitioners are liable for the accuracy-

related penalty under section 6662(a) on the ground of negligence. Section 6662(a)

and (b)(1) authorizes the Commissioner to impose a 20% penalty on the portion of

an underpayment of income tax attributable to negligence or disregard of rules or

regulations. Negligence is defined as any failure to make a reasonable attempt to

comply with the provisions of the internal revenue laws. Sec. 6662(c); sec. 1.6662-

3(b)(1), Income Tax Regs. The term "disregard" includes any careless, reckless, or

intentional disregard. Sec. 6662(c); sec. 1.6662-3(b)(1) and (2), Income Tax Regs.

Disregard of rules or regulations is careless "if the taxpayer does not exercise

---

[15]Because of our holding, we do not need to reach the sec. 183 issue.

reasonable diligence to determine the correctness of a return position" and is reckless if "the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable person would observe." Sec. 1.6662-3(b)(2), Income Tax Regs.; see also Neely v. Commissioner, 85 T.C. 934, 947 (1985).

On the basis of petitioner's testimony regarding his recordkeeping, which we find credible, we find that he created and maintained a recordkeeping system and organized records into a spreadsheet for return preparation. Petitioner attempted to comply with the requirements for deducting business expenses under section 162 and to assess his and Mrs. Bramlett's proper tax liability. We find that petitioners were not negligent and did not disregard rules or regulations in believing that petitioner's expenses were deductible, in particular after respondent allowed substantial deductions for similar items for 2006. Therefore, we hold that petitioners are not liable for the section 6662(a) penalty.

We have considered all arguments raised by either party, and to the extent not discussed, we find them to be irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.