# United States Tax Court

T.C. Memo. 2023-87

CASSANDRA TUCKER AND EDWARD BRODIE,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 7896-19.                    Filed July 17, 2023.

————

Cassandra Tucker and Edward Brodie, pro sese.

*Paul Colleran* and *Carlton W. King*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

ASHFORD, *Judge*: By statutory notice of deficiency dated February 14, 2019, the Internal Revenue Service (IRS or respondent) determined deficiencies in petitioners' federal income tax, additions to tax pursuant to section 6651(a)(1),[1] and accuracy-related penalties pursuant to section 6662(a) for the 2015–17 taxable years (years at issue) as follows:

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

| [*2] | | Additions to Tax/Penalties | |
|---|---|---|---|
| Year | Deficiency | § 6651(a)(1) | § 6662(a) |
| 2015 | $3,711 | — | $742 |
| 2016 | 28,754 | $2,930 | 5,751 |
| 2017 | 17,177 | — | 3,435 |

After certain concessions by the parties,[2] the issues remaining for decision are whether petitioners[3] are entitled to (1) deductions for certain expenses they reported on 2015–17 Schedules C and cost of goods sold (COGS) they reported on 2015 and 2016 Schedules C; (2) a deduction for cash charitable gifts they claimed on their 2017 Schedule A in an amount greater than respondent has allowed; and (3) additional deductions for purported mortgage interest paid that they

---

[2] By way of a Stipulation of Settled Issues (and reiterated in the First Stipulation of Facts), the parties made numerous concessions for the years at issue. They are as follows. Petitioners now agree that they have additional income attributable to state income tax refunds for 2016 and 2017, and income attributable to qualified dividends and individual retirement account (IRA) distributions for 2016. Additionally, petitioners now agree that they are subject to the section 72(t) 10% additional tax with respect to the IRA distributions, but the parties agree that the amount of the additional tax should be reduced by $1,000. Petitioners also now agree that they are not entitled to deduct on their 2016 and 2017 Schedules A, Itemized Deductions, home mortgage interest paid to the extent of $18,526 and $14,736, respectively. Finally, petitioners now agree that they are liable for the section 6651(a)(1) addition to tax for 2016. Respondent now agrees that petitioners are entitled to deductions they claimed on (1) their 2015–17 Schedules E, Supplemental Income and Loss, for mortgage interest paid with respect to certain real property (as discussed *infra* pp. 3–4, 7), (2) their 2016 Schedule A for cash charitable contributions of $9,250, and (3) their 2017 Schedule A for cash charitable contributions of $13,050 to a certain church (as discussed *infra* pp. 5–6). Respondent also now agrees that there is no additional income reported on Schedule C, Profit or Loss From Business, attributable to gross receipts or sales of Ms. Tucker's sole proprietorship (as discussed *infra* pp. 3–5) for 2017. Finally, respondent now agrees that petitioners are not liable for section 6662(a) accuracy-related penalties for the years at issue.

At trial (by way of Ms. Tucker's testimony), because of a "mistake" petitioners now agree that they are not entitled to $2,676 of the $3,200 deduction they claimed on the 2017 Schedule C for Ms. Tucker's sole proprietorship for advertising expenses.

[3] Mr. Brodie did not appear in Court at trial, but the Court's decision will be binding upon both spouses.

[*3] did not claim on their 2015–17 Schedules E. With respect to the first issue, we uphold in part the IRS's determinations, and with respect to the second and third issues, we uphold the IRS's determinations.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The First Stipulation of Facts, the Second Stipulation of Facts, and the attached Exhibits are incorporated herein by this reference. Petitioners resided in Massachusetts when they timely filed their Petition with the Court.

I.    *Petitioners' Educational and Professional Backgrounds*

Petitioners are a married couple and have been married since at least 2012. During 2015 their marital residence was a 1,500-square-foot apartment in West Newbury, Massachusetts (West Newbury residence), that they rented; during 2016 and 2017 (and continuing up to at least the time of trial) their marital residence was a 2,700-square-foot, four-bedroom single-family home in Dorchester, Massachusetts (Dorchester residence), that they owned.

Ms. Tucker is a college graduate, having received her undergraduate degree in computer science from Framingham State College (now Framingham State University) in Framingham, Massachusetts. Up until sometime in 2010 she worked as a software engineer. In 2010, while still working as a software engineer, she started a sole proprietorship named "Camarbre," and since at least 2012 she has operated Camarbre full time. Camarbre is a "fashion lifestyle brand," but Ms. Tucker has struggled to make it successful as reflected by the Schedules C for Camarbre that petitioners attached to their 2012–19 federal income tax returns.

The record is silent as to Mr. Brodie's educational background, but professionally during at least the years at issue he was employed as a "W−2 wage earner" at Enernoc, Inc., and owned and operated a sole proprietorship named "Eddie's Consultanting" that provided computer consulting services.[4] Additionally, as discussed *infra* p. 7, since at least 2012 Mr. Brodie owned real property in Manchester, New Hampshire

---

[4] For at least the years at issue petitioners reported the income and expenses from Mr. Brodie's computer consulting activity on Schedules C, but the only Schedules C that are at issue in this case are the 2015–17 Schedules C for Camarbre.

[*4] (Manchester property) with his friend Martin Nassy that they rented and received rental income.

## II. *Ms. Tucker's Fashion Activities—Camarbre*

Ms. Tucker has "been in the fashion industry" pretty much her whole life. Her mother had her own fabric store; she learned to sew when she was six years old, using her mother's sewing machine; and she did some modeling when she was younger.

The name Camarbre is a combination of Ms. Tucker's and her two daughters' names. Ms. Tucker intends Camarbre to sell both high- and low-end clothing, shoes, handbags, accessories, and makeup for women with the hopes of extending the brand to men as well; she likens Camarbre to be a fashion house such as Ralph Lauren.

Ms. Tucker has always operated Camarbre out of petitioners' marital residence, dedicating certain space in the residence to store Camarbre's materials, such as fabric and packaging. To that end, during at least the years at issue, Ms. Tucker purchased materials with no particular orders in mind. For example, during 2016 she purchased 15,000 lip gloss containers and 12,000 paper boxes for future lip gloss sales; indeed, Camarbre did not begin to sell lip gloss until the end of 2019 or early 2020. Additionally, she did not have on hand clothing or other products that were ready for purchase; instead, she had samples of Camarbre clothing and other products stored at petitioners' marital residence to show potential customers and would make items "custom" as they were ordered.

Ms. Tucker created a website (or had one created) for Camarbre that was operable during the years at issue. In 2016 she promoted Camarbre by appearing, together with models wearing Camarbre samples, on a television show called Hidden Gemz on SMAC TV, a local public access cable channel. Although there was no charge to appear on the television show, she incurred $5,180 in expenses for models, a hair stylist, and a makeup artist, paying that amount directly to the host of the show (and from whom she received a receipt). As noted *infra* p. 9, petitioners claimed a deduction for that amount as advertising on the 2016 Schedule C for Camarbre. Additionally, Ms. Tucker held two trunk shows—one in 2015 and another in 2017, with each trunk show generating the only income for Camarbre for those years ($1,542 for 2015 and $1,498 for 2017, amounts, as noted *infra* pp. 8−9, petitioners reported as gross receipts or sales on the Schedules C for Camarbre for

[*5] 2015 and 2017, respectively). She believed trunk shows, fashion shows, and the like to be useful forms of advertising.

During the years at issue Ms. Tucker maintained a business bank account for Camarbre at Central One Federal Credit Union (Central One). Often there were not enough funds in the Central One account and so she paid for purported Camarbre expenses from other bank accounts, including an account Mr. Brodie had at Eastern Bank and joint accounts that she shared with him at Bank of America and TD Bank.

Ms. Tucker kept spreadsheets documenting Camarbre's gross receipts or sales and purported expenses. Those spreadsheets show that Camarbre had gross receipts or sales and net losses for 2012–19 as follows:

| Year | Gross Receipts or Sales | Net Loss |
|------|------------------------|----------|
| 2012 | $2,368 | $39,424 |
| 2013 | -0- | 26,223 |
| 2014 | 1,107 | 28,576 |
| 2015 | 1,542 | 20,229 |
| 2016 | -0- | 21,486 |
| 2017 | 1,498 | 23,261 |
| 2018 | -0- | 23,098 |
| 2019 | 813 | 37,044 |

Ms. Tucker blames the slow start of Camarbre on a lack of funding and marketing, but her stated intention is to continue to develop Camarbre. In 2020, just before the onset of the COVID-19 pandemic, Camarbre had "started to take off" in her eyes; she had secured two brand ambassadors, former NFL player Johnathan Cyprien and singer/actor Montell Jordan, and she estimated that Camarbre's gross receipts or sales for that year were between $4,000 and $5,000.

III.   *Petitioners' 2017 Purported Charitable Endeavor*

Petitioners annually choose a community-focused charity to support. In 2017 Ms. Tucker became aware that International Outreach Ministries (IOM), a church in Stoughton, Massachusetts, was facing financial hardship and was in danger of shutting down. As a result,

[*6] petitioners decided to support IOM that year and chose to raise money for IOM by putting on a fashion show. The fashion show took place on November 26, 2017. Ms. Tucker paid all fashion show expenses, from models, hairstylists, and makeup artists to food. She paid all of these expenses in cash (to the church coordinator) or by credit card (to third parties). IOM charged the public to attend the fashion show and kept all those proceeds.

Before the fashion show took place, Ms. Tucker received a letter dated November 5, 2017, from IOM that was signed by Pastor Isaac Adeyemi. The letter thanked her for her donation of $25,000. The letter also stated that IOM was a section 501(c) religious organization duly registered in Massachusetts and "licensed" by the IRS in 1995 and that she could use the letter "for tax purposes including write offs." The letter contained no statement regarding any goods and services that may have been received in exchange for the donation.

Ms. Tucker also received two unsigned documents from IOM. One document was dated November 26, 2017, and titled "IOM 2017 RECEIPT STATEMENT." This document indicated a "Payment" totaling $2,026 for "Models for Fashion Show," "Make-up," "Hair," and "Food." This document contained no statement regarding any goods and services that may have been received in exchange for the "Payment." The other document was dated December 31, 2017, and titled "IOM 2017 BENEFIT FASHION SHOW RECEIPT STATEMENT" (Fashion Show Receipt Statement). This document indicated a "Payment" totaling $14,050 for "Models for Fashion Show (cash)," "Food Fashion Show (visa)," "Make-up Fashion Show (visa)," "Make-up Fashion Show (cash)," "Hair Fashion Show (cash)," and "DMT Models Fashion Show (visa)." This document also indicated that of the $14,050, $12,500 was purportedly paid in cash with the remaining $1,550 purportedly paid by Visa credit card. This document contained no statement regarding any goods and services that may have been received in exchange for the "Payment."

Separate and apart from the fashion show, petitioners made recurring cash charitable gifts to IOM in 2017. Those gifts totaled $11,500.

As noted *infra* p. 10, petitioners deducted $25,000 for cash charitable gifts to IOM on their 2017 Schedule A.

[*7] IV.   *Mr. Brodie's Rental Real Estate Activities: The Manchester Property*

By warranty deed dated March 30, 2007, Messrs. Brodie and Nassy purchased as tenants in common the Manchester property.  In connection with the purchase, they secured two separate mortgages on the Manchester property from Wachovia Mortgage Corp.—one for an original principal amount of $28,000 (smaller mortgage) and the other for an original principal amount of $224,000 (larger mortgage).

Since at least 2012 Messrs. Brodie and Nassy have rented the Manchester property to individuals, some of whom are "Section 8 tenants," and thus collected rental income from those individuals and/or from the New Hampshire Housing Finance Authority (Housing Authority) via New Hampshire's "Section 8" program.  For 2015, for example, in the record is a Form 1099–MISC, Miscellaneous Income, issued by the Housing Authority to Mr. Brodie at the West Newbury residence reflecting $10,467 in Box 1 of the form (Rents).  With respect to the Manchester property, as noted *infra* pp. 8–10, petitioners reported rents received of $39,267, $14,967, and $15,642, and certain expenses paid, including mortgage interest paid of $3,202, $3,170, and $16,199, on their Schedules E for 2015–17, respectively.

With respect to the larger mortgage, in the record are 2015 and 2016 Forms 1098, Mortgage Interest Statement, that were issued in the names of Messrs. Brodie and Nassy and sent to a post office box in Milford, New Hampshire, the same post office box that is listed on the first page of the warranty deed as the address of Messrs. Brodie and Nassy and to which it was indicated that the filed copy should be returned in care of Mr. Nassy.  The 2015 Form 1098 reflects mortgage interest paid of $16,615 and real estate taxes paid of $5,675.  The 2016 Form 1098 reflects mortgage interest paid of $16,244 and real estate taxes paid of $5,584.  With respect to the smaller mortgage, in the record is a 2017 Form 1098 that was issued in the names of Messrs. Brodie and Nassy and sent to the Dorchester residence.  It reflects mortgage interest paid of $3,133 and no real estate taxes paid.

V.   *Petitioners' Tax Reporting for the Years at Issue*

Ms. Tucker prepared and filed petitioners' federal income tax returns (with the assistance of unnamed software) for the years at issue.

[*8]   A.   *2015*

On their 2015 federal income tax return petitioners reported total income of $130,910, consisting of wages attributable to Mr. Brodie of $154,054; ordinary dividends of $313; taxable refunds, credits, or offsets of state and local income taxes of $1,017; a $22,455 business loss, $20,229 of which was from Camarbre (with the remaining $2,226 from Mr. Brodie's computer consulting activities), which they detailed on a Schedule C attached to the 2015 return; a capital gain of $421; and a $2,440 loss from the rental of the Manchester property, which they detailed on a Schedule E attached to the 2015 return.

On the 2015 Schedule C for Camarbre petitioners reported gross income of −$4,968 and total expenses of $15,261.  The gross income consisted of gross receipts or sales of $1,542 and COGS of $6,510.  The total expenses consisted of $4,066 for advertising; $976 for depreciation and section 179 expenses; $1,068 for legal and professional services; $126 for office expenses; $616 for rent or lease of vehicles, machinery, and equipment; $215 for supplies; $2,787 for travel expenses; $281 for meals and entertainment expenses; and $5,126 for utilities.

On the 2015 Schedule E petitioners reported rents received of $39,267 and total expenses of $5,339, which consisted of mortgage interest paid of $3,202 and another item not relevant here.

Ultimately, on their 2015 return petitioners claimed a refund of $12,980.

B.   *2016*

On their 2016 federal income tax return petitioners reported total income of $111,797, consisting of wages attributable to Mr. Brodie of $148,488; taxable refunds, credits, or offsets of state and local income taxes of $2,102; a $23,206 business loss, $21,486 of which was from Camarbre (with the remaining $1,720 from Mr. Brodie's computer consulting activities), which they detailed on a Schedule C attached to the 2016 return; a capital loss of $3,000; and a $12,587 loss from the rental of the Manchester property, which they detailed on a Schedule E attached to the 2016 return.  Petitioners also attached to their 2016 return a Schedule A, claiming $44,466 of itemized deductions.

On the 2016 Schedule C for Camarbre petitioners reported gross income of −$162 and total expenses (before expenses for business use of their home) of $20,385.  The gross income consisted of COGS of $162.

[*9] The total expenses (before expenses for business use of their home) consisted of $5,180 for advertising; $260 for commissions and fees; $734 for depreciation and section 179 expenses; $128 for office expenses; $8,460 for supplies; $260 for taxes and licenses; $1,267 for travel expenses; $411 for meals and entertainment expenses; and $3,685 for utilities. Petitioners also reported on this schedule expenses for business use of their home of $939, attaching Form 8829, Expenses for Business Use of Your Home, to their 2016 return. In Part I of this form petitioners reported that 264 square feet of the 2,700-square-foot Dorchester residence (i.e., 9.78%) was used for Camarbre, and in Part II of this form they reported as indirect expenses, among other items not relevant here, utilities of $3,200.

On the 2016 Schedule E petitioners reported rents received of $14,967 and total expenses of $27,554, which consisted of, among other items not relevant here, mortgage interest paid of $3,170.

On the 2016 Schedule A petitioners reported taxes paid totaling $7,978; home mortgage interest paid of $26,171; and gifts to charity totaling $10,317, consisting of cash charitable gifts of $9,250 and noncash charitable gifts of $1,067.

Ultimately, on their 2016 return petitioners claimed a refund of $17,036.

C.    *2017*

On their 2017 federal income tax return petitioners reported total income of $129,685, consisting of wages attributable to Mr. Brodie of $160,246; taxable interest of $14; ordinary dividends of $51, taxable refunds, credits, or offsets of state and local taxes of $2,139; a $27,863 business loss, $23,261 of which was from Camarbre (with the remaining $4,602 attributable to Mr. Brodie's computer consulting activities), which they detailed on a Schedule C attached to the 2017 return; a capital loss of $3,000; taxable IRA distributions of $4,870; and a $6,772 loss from the rental of the Manchester property, which they detailed on a Schedule E attached to the 2017 return. Petitioners also attached to their 2017 return a Schedule A, claiming $68,388 of itemized deductions.

On the 2017 Schedule C for Camarbre petitioners reported gross income of –$6,588 and total expenses (before expenses for business use of their home) of $12,077. The gross income consisted of gross receipts or sales of $1,498 and COGS of $8,086. The total expenses (before expenses for business use of their home) consisted of $3,200 for

[*10] advertising; $562 for depreciation and section 179 expenses; $500 for legal and professional fees; $486 for office expenses; $1,578 for repairs and maintenance; $260 for supplies; $379 for meals and entertainment expenses; and $5,112 for utilities. Petitioners also reported on this schedule expenses for business use of their home of $4,596, attaching a Form 8829 to their 2017 return. In Part I of this form petitioners reported that 567 square feet of the 2,700-square-foot Dorchester residence (i.e., 21%) was used for Camarbre.

On the 2017 Schedule E petitioners reported rents received of $15,642 and total expenses of $33,985, which consisted of, among other items not relevant here, mortgage interest paid of $16,199.

On the 2017 Schedule A petitioners reported taxes paid of $7,736; home mortgage interest paid of $35,652; and gifts to charity totaling $25,000, consisting of purported cash charitable gifts to IOM.

Ultimately, on their 2017 return petitioners claimed a refund of $19,380.

VI.    *Tax Court Proceedings*

At trial (by way of the Second Stipulation of Facts and Ms. Tucker's testimony) petitioners took the position that they are entitled to additional Schedule E deductions for mortgage interest paid with respect to the Manchester property that they did not claim on their 2015–17 Schedules E.

OPINION

I.    *Burden of Proof*

In general, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving otherwise. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Tax deductions are a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to any deduction claimed. *Segel v. Commissioner*, 89 T.C. 816, 842 (1987). This burden requires the taxpayer to demonstrate that the deductions claimed are allowable pursuant to some statutory provision and to substantiate the expenses giving rise to the deductions claimed by maintaining and producing adequate records that enable the Commissioner to determine

**[\*11]** the taxpayer's correct liability.[5]  § 6001; *Higbee v. Commissioner*, 116 T.C. 438, 440 (2001); *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976); Treas. Reg. § 1.6001-1(a).

II.    *Schedule C Issues*

A.    *Expenses*

Section 162 allows a taxpayer to deduct all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business.  § 162(a); Treas. Reg. § 1.162-1(a).  A business expense is "ordinary" if it is "normal, usual, or customary" in the taxpayer's trade or business or arises from a transaction "of common or frequent occurrence in the type of business involved." *Deputy v. du Pont*, 308 U.S. 488, 495 (1940).  An expense is "necessary" if it is "appropriate and helpful" to the development and operation of the taxpayer's business, but it need not be absolutely essential.  *Commissioner v. Tellier*, 383 U.S. 687, 689 (1966) (quoting *Welch v. Helvering*, 290 U.S. at 113).  A taxpayer may not deduct a personal, living, or family expense unless the Internal Revenue Code expressly provides otherwise. § 262(a).  The determination of whether an expense satisfies the requirements of section 162 is a question of fact.  *Cloud v. Commissioner*, 97 T.C. 613, 618 (1991) (citing *Commissioner v. Heininger*, 320 U.S. 467, 473–75 (1943)).

As we have previously indicated, the burden of substantiating expenses rests with the taxpayer.  To this end, under the *Cohan* rule, if the taxpayer establishes that an expense is deductible but is unable to substantiate the precise amount, the Court may estimate the amount of the deductible expense, bearing heavily against the taxpayer whose inexactitude is of his or her own making.  *See Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930); *see also Vanicek v. Commissioner*, 85

---

[5] If the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining his or her federal income tax liability and meets certain other requirements, the burden of proof shifts from the taxpayer to the Commissioner as to that factual issue.  § 7491(a)(1) and (2).  On brief petitioners allege that the burden of proof should shift to respondent pursuant to section 7491(a) because of "the documents supplied."  We do not need to decide whether petitioners have met all of the requirements under section 7491 to shift the burden of proof to respondent; the outcome of this case is based on a preponderance of the evidence and thus is unaffected by section 7491.  In any event, on the basis of the record before us, we have doubts as to whether petitioners have established that all of the requirements for shifting the burden of proof under that section have been met.

**[\*12]** T.C. 731, 742–43 (1985). In order for the Court to estimate the amount of a deductible expense, the taxpayer must establish some basis upon which an estimate may be made. *Norgaard v. Commissioner*, 939 F.2d 874, 879 (9th Cir. 1991), *aff'g in part, rev'g in part* T.C. Memo. 1989-390; *Vanicek*, 85 T.C. at 742–43. Otherwise an allowance would amount to "unguided largesse."[6] *Norgaard v. Commissioner*, 939 F.2d at 879 (quoting *Williams v. United States*, 245 F.2d 559, 560 (5th Cir. 1957)).

Petitioners continue to maintain that they should be allowed their claimed Schedule C deductions for Camarbre in the following categories: (1) supplies for 2016, (2) advertising for 2016 and 2017, and (3) utilities for the years at issue. Below we address each category in turn.

### 1. *Supplies*

On the 2016 Schedule C for Camarbre petitioners deducted $8,460 for supplies. In support of the underlying expense petitioners rely on a spreadsheet Ms. Tucker kept showing items purchased totaling $8,460 (2016 supplies spreadsheet), $640 for eight different purchases of fabric at various retail stores and $7,820 for a single purchase of lip gloss cases and packaging. At trial Ms. Tucker proffered and the Court admitted into evidence copies of a packaging label from a Chinese cosmetics packaging company and an invoice from that company dated July 1, 2016, for $7,800 for the purchase of 15,000 empty plastic cases and 12,000 paper boxes designed to hold lip gloss. Although Ms. Tucker was unable to provide bank records showing that she paid for these cases and boxes and she could not remember how she paid for them, she did show the Court while testifying a few of the cases and boxes she had purchased.[7] The bank records from Ms. Tucker's Central One account and the Bank of America account she shared with Mr. Brodie substantiate five of the eight purchases of fabric and other related items shown on the 2016 supplies spreadsheet—on January 28, 2016, of $241 and $152; on November 15, 2017, of $24; on November 21, 2017, of $38; and on December 31, 2017, of $160.[8]

---

[6] The *Cohan* rule is superseded—that is, estimates are not permitted—for certain expenses specified in section 274, and instead those types of expenses are subject to strict substantiation rules. In this case, none of the expenses specified in section 274 are at issue and thus they are not subject to strict substantiation rules.

[7] The trial was conducted virtually.

[8] Ms. Tucker's 2016 supplies spreadsheet shows the two November 2017 purchases and the one December 2017 purchase as having been made in 2016.

**[*13]** Section 263A requires that both direct and indirect costs of property produced by the taxpayer should be capitalized.[9] § 263A(a) and (b)(1).  The Treasury regulations accompanying section 263A state that:

> If property is held for future production, taxpayers must capitalize direct and indirect costs allocable to such property (e.g., purchasing, storage, handling, and other costs), even though production has not begun.  If property is not held for production, indirect costs incurred prior to the beginning of the production period must be allocated to the property and capitalized if, at the time the costs are incurred, it is reasonably likely that production will occur at some future date.  Thus, for example, a manufacturer must capitalize the costs of storing and handling raw materials before the raw materials are committed to production.

Treas. Reg. § 1.263A-2(a)(3)(ii).

On the basis of the record before us, for 2016 petitioners substantiated supplies expenses of $241 and $152.  Additionally for 2016, we conclude, pursuant to the *Cohan* rule, that they substantiated supplies expenses of $7,800.  However, Ms. Tucker testified that at least during the years at issue, she purchased materials with no particular orders in mind, storing them at petitioners' marital residence; indeed, Camarbre did not begin selling lip gloss until the end of 2019 or early 2020, and she made Camarbre clothing only to order, i.e., nothing was ready for purchase.  Given that Camarbre had no reported gross receipts or sales for 2016 and it is apparent from Ms. Tucker's testimony that the substantiated supplies were purchased and stored for future use, petitioners cannot deduct their costs as current expenses but must capitalize them pursuant to section 263A and the accompanying Treasury regulations.

Accordingly, petitioners are not entitled to the deduction claimed on the 2016 Schedule C for Camarbre for supplies expenses in any amount, and we sustain the IRS's determination in this regard.

---

[9] There is an exception to the requirement to capitalize costs for small business taxpayers, § 263A(i), but this exception is not applicable for the years at issue in this case as the exception is applicable for taxable years beginning after December 31, 2017, Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 13102(e), 131 Stat. 2054, 2104.

**[\*14]**       2.    *Advertising*

On the 2016 Schedule C for Camarbre petitioners claimed a deduction of $5,180 for advertising expenses. Ms. Tucker credibly testified that this amount was solely for expenses she incurred to promote Camarbre when she appeared, together with hired models wearing Camarbre samples, on the Hidden Gemz television show on SMAC TV. Additionally, documentary evidence, i.e., a receipt that Ms. Tucker received from the host of Hidden Gemz, shows that Ms. Tucker indeed paid this amount.

Nowadays, advertising through media comes in many different forms, from traditional forms, such as broadcast (i.e., television and radio) and print (i.e., newspapers, magazines, signs, and billboards), to new forms, such as websites, apps, emails, podcasts, blogs, and social networks. We view Ms. Tucker's appearance promoting Camarbre on the Hidden Gemz television show as the equivalent of an extended, live television commercial, more along the lines of a traditional form of advertising through media. Furthermore, it is apparent that Ms. Tucker's primary motive or purpose in appearing on the show was to increase Camarbre's visibility and in turn generate sales of Camarbre products. Thus, on the basis of the record before us, we conclude that the expenses Ms. Tucker incurred by appearing on the show had a reasonably proximate relationship to Camarbre and Ms. Tucker's primary motive or purpose for incurring the expenses, *see Whalley v. Commissioner*, T.C. Memo. 1996-533, slip op. at 16–17 (citing *Henry v. Commissioner*, 36 T.C. 879, 884 (1961)); thus, petitioners are entitled to deduct advertising expenses on the 2016 Schedule C for Camarbre.

On the 2017 Schedule C for Camarbre petitioners deducted $3,200 for advertising expenses. Referencing certain documentary evidence, i.e., a spreadsheet she kept for Camarbre's purported 2017 advertising expenses and debit card entries on bank records from Mr. Brodie's Eastern Bank account, at trial Ms. Tucker testified that petitioners were mistaken in claiming a deduction for $2,676 of the $3,200 amount and that the remaining $524 was for maintaining the Camarbre website and "internet service[s]."

With respect to the remaining disputed amount, the documentary evidence is sufficient to substantiate deductible advertising expenses of $316—the total cost to Ms. Tucker in 2017 to maintain the Camarbre

**[\*15]** website through Wix.com and Amazon Web Service.[10]  Although the documentary evidence also substantiates total payments of $208 (the remainder of the $524), these payments are for internet, cable, and telephone services provided by Comcast and RCN to the Dorchester residence, which are inherently personal expenses.  *See* § 262(a).  Petitioners have neither shown what portion of those expenses should properly be allocated to Camarbre as deductible advertising expenses nor provided a reasonable basis for the Court to estimate the amount deductible under the *Cohan* rule.  Thus, petitioners are entitled to a 2017 Schedule C deduction with respect to Camarbre of only $316 for advertising.

Accordingly, we do not sustain the IRS's determination with respect to the deduction claimed on the 2016 Schedule C for Camarbre for advertising, and we sustain in part the IRS's determination with respect to the deduction claimed on the 2017 Schedule C for Camarbre for advertising.

### 3.    *Utilities*

On the 2015–17 Schedules C petitioners claimed deductions for utilities of $5,126, $3,685, and $5,112, respectively, which they assert are for expenses such as water, propane, electricity, and internet and cellular phone service for their personal residence (i.e., the West Newbury residence in 2015 and the Dorchester residence in 2016 and 2017).  Referencing certain documentary evidence, i.e., spreadsheets she kept for Camarbre's purported utilities for the years at issue and bank records from Mr. Brodie's Eastern Bank account and their shared Bank of America and TD Bank accounts, at trial Ms. Tucker testified that she arrived at these respective amounts by taking the total amount paid in each year ($10,717, $8,134, and $9,471, respectively) and multiplying the amount by the portion or percentage of petitioners' residence that she used for Camarbre, which she estimated to be approximately one-third each year.

Section 280A prohibits business expense deductions related to the use of a dwelling unit which is used by the taxpayer during the taxable year as his or her residence, unless an exception applies.  As relevant

---

[10] On brief, it appears that respondent may concede in any event that petitioners are entitled a Schedule C deduction of this amount for 2017, stating that "[o]f the remainder, respondent agrees that Tucker paid $315.55 toward upkeep of the camarbre.com website, which would seem to respondent to be related to the fashion activity."

**[\*16]** here, two exceptions are for areas of the residence used exclusively as the taxpayer's principal place of business or for business storage (but only if the dwelling unit is the sole fixed location of such trade or business). *See* § 280A(c)(1)(A), (2). These exceptions, however, are not without limitation. To that end, as relevant here, section 280A(c)(5) limits a taxpayer's deductions for the business use of his or her residence to the amount that the gross income generated from the business activity conducted in the residence exceeds the amount of deductions attributable to such activity that are allowable regardless of whether the residence was used for business (such as mortgage interest and real estate taxes) plus deductions attributable to such activity that are not allocable to the business use of the residence itself. *See also Tobin v. Commissioner*, T.C. Memo. 1999-328, slip op. at 19. In other words, no deduction for use of a residence may be claimed if the deduction would give rise to, or increase, a net loss from the business to which the deduction relates. *Visin v. Commissioner*, T.C. Memo. 2003-246, slip op. at 9, *aff'd*, 122 F. App'x 363 (9th Cir. 2005).

On the basis of the record before us, it is apparent that petitioners' claimed 2015–17 Schedule C deductions for utilities in connection with the use of their residence for Camarbre are subject to the section 280A(c)(5) limitation. Applying that limitation with respect to 2015, we conclude that petitioners are not entitled to the deduction claimed. For 2015 Camarbre's reported gross receipts or sales were $1,542; petitioners did not have any "non-Camarbre" residential deductions for the West Newbury residence, such as mortgage interest or real estate taxes, as they rented this residence; and they claimed Schedule C deductions for Camarbre unrelated to the residence that exceed Camarbre's reported gross receipts or sales. For 2016 Camarbre had no reported gross receipts or sales. For 2017 Camarbre's reported gross receipts or sales were $1,498; the parties now agree that petitioners are entitled to a Schedule A deduction for home mortgage interest paid with respect to the Dorchester residence of $20,916; any allocable 2017 home mortgage interest plus petitioners' claimed Schedule C deductions for Camarbre unrelated to this residence exceed Camarbre's reported gross receipts or sales.

Even if the section 280A(c)(5) limitation was not applicable here, petitioners would not be entitled to deduct utilities expenses on the 2015–17 Schedules C for Camarbre because of their failure to properly substantiate the expense amounts (and on the basis of the record before us we would be unable to make estimates of their deductibility under the *Cohan* rule). At trial Ms. Tucker's testimony with respect to these

[*17] expenses and the use of petitioners' marital residence during the years at issue for Camarbre was at best imprecise and at worst contradictory. For example, she testified that she used about one-third of petitioners' marital residence for Camarbre; but when the Court pointed out that using that measure for 2015 resulted in an improbably high amount of utilities expenses allocable to Camarbre given the size of the West Newbury residence, she could not explain why the amount was so high. A comparison of the amounts shown on Ms. Tucker's spreadsheets for total utilities paid for petitioners' marital residence for the years at issue to the amounts they claimed for utilities on the 2015–17 Schedules C for Camarbre reveals an actual claimed percentage use of the residence for Camarbre of 47.82% for 2015, 45.30% for 2016, and 53.97% for 2017, but she did not provide an explanation at trial regarding these discrepancies. Neither did she explain at trial why on the 2016 Form 8829 for Camarbre, petitioners reported using 264 square feet of the 2,700-square-foot Dorchester residence (i.e., 9.78%) for Camarbre and that they incurred $3,200 of utilities expenses, in addition to the claimed Schedule C deduction for utilities.

Accordingly, we sustain the IRS's determinations with respect to the deductions claimed on the 2015–17 Schedules C for Camarbre for utilities.

### B. *COGS*

On the 2015 and 2017 Schedules C for Camarbre petitioners reported COGS of $6,510 and $8,086, respectively. In support of these costs petitioners rely on spreadsheets Ms. Tucker kept showing items purchased totaling $6,510 (2015 COGS spreadsheet) and $9,003 (2017 COGS spreadsheet). The 2015 COGS spreadsheet shows multiple purchases of fabric totaling $3,744; packaging materials, including "bags, tissue, ribbon and boxes," totaling $2,703; and a single purchase of "tags" for $64. The 2017 COGS spreadsheet shows multiple purchases of "lifestyle flooring" totaling $6,676 and "lifestyle closet" totaling $2,327. Other documentary evidence, i.e., receipts and debit card entries from Ms. Tucker's Central One bank account, Mr. Brodie's Bank of America account, and their shared TD Bank account, substantiate purchases made totaling $4,430 and $4,804 for 2015 and 2017, respectively.

COGS is not a deduction within the meaning of section 162(a) but is subtracted from gross receipts to compute gross business income. *Richmond Patients Grp. v. Commissioner*, T.C. Memo. 2020-52, at *14

**[\*18]** (first citing *Max Sobel Wholesale Liquors v. Commissioner*, 69 T.C. 477 (1977), *aff'd*, 630 F.2d 670 (9th Cir. 1980); and then citing Treas. Reg. § 1.162-1(a)); *see also BRC Operating Co. v. Commissioner*, T.C. Memo. 2021-59, at \*8; *Singh v. Commissioner*, T.C. Memo. 2018-132, at \*7, *aff'd*, 812 F. App'x 579 (9th Cir. 2000). COGS is the cost of acquiring inventory through either production or purchase. *Richmond Patients Grp.*, T.C. Memo. 2020-52, at \*14. COGS cannot be claimed unless the taxpayer has gross receipts or sales of goods in the taxable year for which COGS is claimed. *BRC Operating Co.*, T.C. Memo. 2021-59, at \*13 (citing *Weaver v. Commissioner*, T.C. Memo. 2004-108). Furthermore, any amount claimed as COGS still has to be substantiated. *Id.* at \*10.

COGS is generally determined under section 471 and its accompanying Treasury regulations. *Richmond Patients Grp.*, T.C. Memo. 2020-52, at \*14 (citing Treas. Reg. §§ 1.471-3, 1.471-11). Section 471 and its accompanying Treasury Regulations direct taxpayers to section 263A for additional rules. *Richmond Patients Grp.*, T.C. Memo. 2020-52, at \*15. To that end, as indicated *supra* p. 13, under section 263A(a) and (b)(1) and accompanying Treasury Regulation § 1.263A-2(a)(3)(ii), if property is held for future production, taxpayers must capitalize the direct and indirect costs allocable to such property.

With respect to 2015, on the basis of the record before us, petitioners substantiated COGS for purchased materials of $4,430 (but no more, and we are unable to make an estimate of additional amounts under the *Cohan* rule). Camarbre reported gross receipts or sales of $1,542 for 2015, but Ms. Tucker testified that she purchased materials with no particular orders in mind and stored them at petitioners' marital residence; therefore, petitioners are entitled to COGS of $1,542 (the amount equal to Camarbre's 2015 reported gross receipts or sales). The remaining substantiated amount of $2,887 must be capitalized pursuant to section 263A and the accompanying Treasury regulations, and the remaining unsubstantiated amount of $2,081 is not allowable as COGS and is neither capitalizable nor currently deductible.

With respect to 2017, on the basis of the record before us, petitioners substantiated purchases of "lifestyle flooring" and "lifestyle closet" totaling $4,804. Regarding these purchases, Ms. Tucker testified that they were for interior design work she did on behalf of two clients, an unnamed individual and a business called Salon Monet. Ms. Tucker further testified that she did this work as part of Camarbre's "lifestyle brand," but when also asked to describe Camarbre she described it

**[\*19]** (consistently with how it is described on the Schedules C for Camarbre) as a business engaged in fashion (and not one that offers or provides interior design services).  Given this self-serving testimony (which we are not bound to accept, *see Shea v. Commissioner*, 112 T.C. 183, 189 (1999) (citing *Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986)), and which was conflicting in any event), we conclude that petitioners failed to demonstrate that the substantiated purchases were of types that are ordinary and necessary business expenses of Camarbre.  Thus, despite Camarbre having reported gross receipts or sales of $1,498 for 2017, petitioners are neither entitled to COGS in any amount in computing Camarbre's gross income, nor entitled to capitalize or currently deduct those 2017 purchases.

Accordingly, we sustain in part the IRS's determination with respect to COGS for 2015, and we sustain in full the IRS's determination with respect to COGS for 2017.

III.    *Schedule A Issue*

Taxpayers are allowed as a deduction any charitable contribution made during the taxable year.  § 170(a)(1).  A charitable contribution is defined as "a contribution or gift to or for the use of" a charitable organization.  § 170(c).  There are substantiation and recordkeeping requirements for certain charitable contributions.  *See* § 170(f)(8).  As relevant here, no charitable contribution deduction is allowed for any contribution of $250 or more unless the taxpayer substantiates the contribution with a "contemporaneous written acknowledgment" (CWA) from the charitable organization.  § 170(f)(8)(A).  For cash contributions the CWA must include: (1) the amount of cash contributed; (2) whether the charitable organization provided any goods or services in consideration for the contribution; and (3) a description and good-faith estimate of the value of any goods or services provided by the charitable organization, or if such goods and services consist solely of intangible religious benefits, a statement to that effect.  § 170(f)(8)(B); Treas. Reg. § 1.170A-13(f)(2); *see also Oatman v. Commissioner*, T.C. Memo. 2017-17, at \*13−14.    Additionally, expenses incurred incident to the performance of services for a charitable organization may be deductible, but they are subject to similar substantiation requirements. Treas. Reg. § 1.170A-13(f)(10).  Furthermore, no charitable contribution is generally allowed for any contribution of a cash, check, or other monetary gift unless the taxpayer maintains as a record of such contribution (1) a bank record (i.e., canceled check), (2) a written communication (i.e., receipt or letter) from the charitable organization showing the organization's

**[\*20]** name and the date and the amount of the contribution, or (3) "other reliable written records" showing the taxpayer's name, and the date and amount of the contribution. § 170(f)(17); Treas. Reg. § 1.170A-13(a).

On their 2017 Schedule A petitioners claimed a deduction for cash charitable gifts to IOM totaling $25,000. In the February 14, 2019, notice of deficiency issued to them, the IRS determined that this deduction should be disallowed. Later, before trial, respondent conceded that petitioners substantiated (and thus are entitled to a Schedule A charitable contribution deduction for) cash charitable gifts to IOM of $13,050. Petitioners contend that they are entitled to an additional Schedule A charitable contribution deduction for cash charitable gifts to IOM of $14,050, the total amount Ms. Tucker purportedly spent for putting on the fashion show for IOM in 2017.[11]

Petitioners have failed to properly substantiate the $14,050 amount. Ms. Tucker merely provided self-serving testimony in this regard (that was also conflicting in any event). Although she received three different written communications from IOM with respect to the fashion show (primarily relying on the Fashion Show Receipt Statement), all three communications are woefully inadequate for purposes of satisfying the section 170(f)(8)(B) CWA requirements, which are applicable here because each separate amount listed in the Fashion Show Receipt Statement is greater than $250. To wit, each communication fails to indicate whether IOM provided any goods or services in consideration for Ms. Tucker's purported contribution. *See* § 170(f)(8)(B)(ii); Treas. Reg. § 1.170A-13(f)(2)(ii). Although a CWA need not take any particular form, it must meet the requirements of section 170(f)(8)(B). *French v. Commissioner*, T.C. Memo. 2016-53, at \*7–8. The doctrine of substantial compliance does not apply to excuse compliance with these strict substantiation requirements. *Id.* at \*8; *see also Addis v. Commissioner*, 118 T.C. 528, 536 (2002), *aff'd*, 374 F.3d 881 (9th Cir. 2004); *Big River Dev., L.P. v. Commissioner*, T.C. Memo. 2017-166, at \*8–9.

Accordingly, petitioners are not entitled to a 2017 Schedule A deduction for cash charitable gifts to IOM in an amount greater than respondent has allowed.

---

[11] If petitioners were to prevail on the fashion show issue, they would be entitled to a 2017 Schedule A charitable contribution deduction of $27,100, an amount exceeding the amount they originally claimed on their 2017 Schedule A.

**[\*21]** IV.    *Schedule E Issue*

During the years at issue Mr. Brodie owned the Manchester property as tenants in common with Mr. Nassy, and they were jointly liable for two mortgages on the property.  On their 2015–17 Schedules E petitioners claimed deductions for mortgage interest paid of $3,202, $3,170, and $16,199, respectively, with respect to the Manchester property.  In the February 14, 2019, notice of deficiency issued to petitioners, the IRS determined that these deductions should be disallowed.  Later, before trial, respondent conceded that petitioners should be allowed these deductions.  Then at trial, relying on a 2015 Form 1099–MISC and three Forms 1098—one for each year at issue— petitioners took the position that they are entitled to additional 2015– 17 Schedule E deductions for mortgage interest paid of $16,615, $16,244, and $3,133, respectively, with respect to the Manchester property.  Ms. Tucker testified that due to a miscommunication with Mr. Brodie, they failed to report these amounts and reported mortgage interest paid with respect to just one mortgage, instead of both mortgages, on the Manchester property.  Ms. Tucker further testified that they should be entitled to deduct these additional amounts because Mr. Brodie, not Mr. Nassy, had been handling the Manchester property on his own with no involvement by Mr. Nassy during the years at issue, including Mr. Brodie's making all mortgage interest payments with respect to the Manchester property.

Section 163(a) allows a deduction for all interest paid or accrued within the taxable year on indebtedness, and section 212(1) and (2) allows a deduction for ordinary and necessary expenses for (1) the production or collection of income or (2) for the management, conservation, or maintenance of property held for the production of income (albeit not as part of a trade or business).  *See Robinson v. Commissioner*, T.C. Memo. 2014-120, at \*16–19 (discussing in pertinent part section 212(1) and (2) in the context of Schedule E deductions), *aff'd*, 615 F. App'x 147 (4th Cir. 2015).  Where a mortgaged property is jointly owned and the co-owners are jointly liable on the mortgage, each owner is entitled to a deduction for the mortgage interest that he or she actually pays out of his own funds. *Shilgevorkyan v. Commissioner*, T.C. Memo. 2023-12, at \*6 (first citing *Jolson v. Commissioner*, 3 T.C. 1184, 1186 (1944); and then citing *Castaneda-Benitez v. Commissioner*, T.C. Memo. 1981-157); *see also Daya v. Commissioner*, T.C. Memo. 2000-360, slip op. at 40−41, 44−45.

[*22] Again, we need not, and do not, accept Ms. Tucker's self-serving testimony when petitioners fail to present credible, corroborative, documentary evidence. *See Shea*, 112 T.C. at 189. Indeed, the 2015 Form 1099–MISC and the 2015–17 Forms 1098 fail to show how much mortgage interest Mr. Brodie actually paid with respect to the Manchester property or what mortgage interest amounts, if any, were paid by Mr. Nassy. Neither do the various bank records in the record substantiate Mr. Brodie's payments with respect to the Manchester property.

Accordingly, petitioners are not entitled to additional Schedule E deductions for purported mortgage interest paid that they did not claim on their 2015–17 Schedules E.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*